**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2871-23

L.B.,

     Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF COMMUNITY AFFAIRS,

     Respondent-Respondent.

_____

Argued September 10, 2025 – Decided October 17, 2025

Before Judges Mayer and Paganelli.

On appeal from the New Jersey Department of Community Affairs, Docket Nos. HCV: 202-19 and HCV: 203-19.

Janet Gravitz argued the cause for appellant (South Jersey Legal Services, Inc., attorneys; Janet Gravitz, Maria A. Born, and Kenneth M. Goldman, on the briefs).

Levi Klinger-Christiansen, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant

Attorney General, of counsel; Levi Klinger-Christiansen, on the brief).

PER CURIAM

L.B. appeals from the April 15, 2024 Department of Community Affairs (DCA) final agency decision terminating her Section 8 voucher program benefits based on her failure to report an increase in her household income and failure to promptly notify and request permission to move to a different apartment.[1] Because we conclude L.B. fails to establish the DCA's decision was arbitrary, capricious or unreasonable and the DCA's decision is supported by credible evidence in the record, we affirm.

## I.

We glean the facts and procedural history from the DCA record, including the parties' stipulations. L.B. "was a participant in the Section 8 Housing Choice

---

[1] "Section 8 rental assistance is a federal program that is pervasively regulated by federal statutes and regulations." Bouie v. N.J. Dep't of Cmty. Affs., 407 N.J. Super. 518, 528 (App. Div. 2009) (citing 42 U.S.C.A. § 1437f; 24 C.F.R. §§ 982.1 to 982.643). "Public Housing Agency (PHA) means any State, county, municipality, or other governmental entity or public body, or agency or instrumentality of these entities, that is authorized to engage or assist in the development or operation of low-income housing under the 1937 Act." 24 C.F.R. § 5.100. In New Jersey, the DCA is the PHA and administers the Section 8 program. See Bouie, 407 N.J. Super. at 528.

A-2871-23

Voucher Program . . . beginning [on] September 1, 2016." DCA paid a portion of L.B.'s rent and L.B. was responsible for the remainder.

The DCA notified L.B. of her obligation to provide "any information requested in connection with annual and interim re-examinations of family income" and "promptly (defined as within ten days in writing) inform DCA of all income sources as well as any changes in income." In addition, the DCA gave L.B. a "Guide to the Section 8 Housing Program," detailing her obligations as a Section 8 housing program participant.

About a week after entering the Program, L.B. submitted a notarized letter to DCA, advising she was no longer employed, and completed a "Zero Income Checklist." Based on this information, L.B.'s monthly rental obligation was reduced to $0.

On or about November 15, 2016, L.B. obtained employment. The offer letter stated L.B.'s pay rate was $24 per hour and provided the email address for the employer's corporate recruiter.

In February 2017, the employer provided a letter to L.B., extending her employment through May 1, 2017, and confirmed all other terms of employment would remain unchanged. The letter provided the employer's email address, but no mailing address or phone number.

A-2871-23

On April 10, 2017, Deborah de la Cretaz, a DCA Technical Assistant, sent L.B. a letter that stated: "I have received your information in reference to your job . . . . Please provide proof of any income that you have received from them since February . . . 2017. I cannot adjust your rent portion unless I know what you are averaged to make per year."

A few weeks later, Quenda Whitecloud, a DCA Field Representative, sent L.B. a letter that stated: "Housing assistance . . . is scheduled to terminate on September 1, 2017[,] unless the information in your file is updated." Among the information to be provided, L.B. was required to submit a "Tenant Information Form" (TIF) by May 12, 2017. In accordance with the TIF, L.B. was required to provide two current and consecutive original pay stubs and payroll summary reports. On the form, L.B. indicated her current income. However, she failed to state her monthly income or attach the required documentation. In addition, L.B. submitted an authorization for the release of information.

Tracy McGovern-Smith, DCA's Principal Field Representative, testified DCA had access to HUD's[2] Enterprise Income Verification (EIV) database.

---

[2] U.S. Department of Housing and Urban Development.

A-2871-23

However, as of April 2017, DCA did not verify L.B.'s income in EIV because L.B. "had[ no]t been working there long enough . . . she had just started."

On May 10, 2017, L.B. provided DCA an extension of employment offer. The letter indicated L.B.'s temporary employment would be extended to June 30, 2017. The letter provided an email address, but no mailing address or phone number.

On June 28, 2017, Whitecloud sent L.B. a letter that stated: "As per our conversation on June 27, 2017, please mail me your employment letter and bank statements. Enclosed is an envelope for your convenience. If you have any questions please feel free to contact me at the above phone number."

On July 7, 2017, L.B.'s employer provided a letter extending her employment to September 30, 2017. Further, the letter advised L.B.'s other terms of employment remained unchanged. The letter provided an email address, but no mailing address or phone number. In addition, L.B. spoke to Whitecloud on the phone in July, and was advised that her information was incomplete to process her Section 8 housing renewal, and she needed to submit pay stubs.

On August 14, 2017, L.B. provided DCA with her "Statement of Earnings and Deductions" for the time period from June 24, 2017 to July 21, 2017. On

A-2871-23

August 18, 2017, DCA "issued a rental portion letter . . . wherein [L.B.'s] rent portion was increased to . . . 100% of the rent payment."

On September 11, 2017, L.B.'s employer advised it no longer required her services effective September 22, 2017. A few weeks later, L.B. submitted a "Statement of Zero Income" to DCA.

On October 6, 2017, McGovern-Smith wrote to L.B. and advised DCA's "[i]nformation . . . indicated that [he]r household ha[d] violated a 'participant' requirement" under:

> 24 C.F.R. [§] 982.552(b)(2) not reporting income to the Program. All information to the Program must be true and accurate. You failed to disclose all required information requested by our office as follows: As head of household you were responsible to report income being received by all household members.
>
> The family must supply any information requested by . . . [DCA] or HUD for the use in a regularly scheduled re-examination or inter re-examination of family income and composition in accordance with HUD requirements. [L.B.] failed to report in writing within ten . . . days her income. The following income amount of $29,878[] was unreported and created a debt of $8,963.40 which is over the maximum limit to repay.
>
> Based on this information, [DCA] has decided to terminate your participation in the Program on the last day of November 2017. . . .
>
> [(Boldface omitted).]

A-2871-23

McGovern-Smith informed L.B. she "ha[d] the right to request an informal hearing . . . before [he]r participation [wa]s actually terminated." L.B. then requested an informal hearing.

On November 17, 2017, following a re-examination, Whitecloud provided L.B. with a "Notice of Housing Assistance Payment and Family Contribution" stating her monthly rental contribution effective October 1, 2017, would be $13.

The informal hearing regarding L.B.'s failure to provide information was conducted on March 16, 2018. On April 13, 2018, the hearing officer, in part, found L.B. "did not provide the requested documentation of her wage income to DCA until [August 14, 2017], when she provided two bi-weekly wage statements . . . . This was over four months after the [April 10, 2017] DCA request letter, and, at a minimum, seven months after her employment . . . began." Further, the hearing officer found L.B. in debt to DCA in an amount that exceeded DCA's discretion to execute a "Repayment Agreement." Therefore, the hearing officer found grounds for termination of L.B.'s benefits.

The hearing officer advised that because "[t]his [wa]s a final administrative decision pursuant to 24 C.F.R. [§] 982.555," L.B. could appeal to the Office of Administrative Law (OAL). L.B. appealed and the matter was transferred to an Administrative Law Judge (ALJ) as a contested case. DCA

7

granted L.B.'s application to stay the termination of her benefits pending the outcome of the contested case.

In September 2018, McGovern-Smith learned that L.B. wanted to move. Karen Barker, a DCA Housing Field Representative, recalled L.B. requested to move, but she could not give her a "moving packet" because there were discrepancies regarding her benefits and she was trying to determine what L.B. owed. Barker advised L.B. she could not move until the issues were resolved.

In October 2018, L.B. sent a "notice to vacate" to her landlord. L.B. explained a family situation might require her to vacate the apartment, but she would know definitively in a week or two. In November, L.B.'s landlord advised it would conduct a move out inspection on December 1, 2018.

On December 4, 2018, L.B. emailed Barker explaining she had been trying to reach her as she had moved out of her apartment on December 1, 2018. She inquired if she could "transfer her voucher or not." Barker advised she needed to discuss the situation with a co-worker.

On December 11, 2018, DCA notified L.B. that her OAL appeal had to be completed before it could process a transfer of her housing voucher to a new apartment. About a week later, L.B. executed a lease for a new apartment.

On March 7, 2019, McGovern-Smith advised L.B. her household violated the "participant" requirement under 24 C.F.R. § 982.551(i) regarding absence from a unit. In a letter to L.B., McGovern-Smith, citing various federal regulations, wrote:

> The family must supply any information or certification requested by [DCA] to verify that the family is living in the unit, or relating to family absence from the unit, including any [DCA] requested information or certification on the purposes of family absences. The family must cooperate with the [DCA] for this purpose. The family must promptly notify the [DCA] of absence from the unit.
>
> You failed to supply [DCA] with notice that you vacated the subsidized unit in writing prior to vacating.
>
> You did not promptly notify the [DCA] that you moved out of the unit.
>
> 24 C.F.R. [§] 982.551(f) Family notice of move or lease termination. The family must notify the [DCA] and the owner before the family moves out of the unit or terminates the lease on notice to the owner.
>
> You failed to notify the [DCA] before you moved out of the unit.
>
> 24 C.F.R. [§] 982.551[](h) Use and occupancy of unit. [(1)] The family must use the assisted unit for residence by the family. The unit must be the family's only residence.
>
> You moved from [the] subsidized unit and had another residence.

A-2871-23

Based on this information, the Section 8 Housing Choice Voucher Program has decided to terminate your participation in the Program on the last day of December 2018. . . .

[(Boldface omitted).]

L.B. appealed the DCA's termination of her participation in the Section 8 housing program based on her relocation. DCA transmitted L.B.'s two appeals to the OAL.

The ALJ conducted a hearing over two days. The DCA called McGovern-Smith, de la Cretaz, Whitecloud, and Barker to testify. L.B. testified on her own behalf and called her friend who was familiar with L.B.'s interactions with DCA.

As to L.B.'s failure to provide required information, the ALJ found L.B. brought the February 23, 2017 letter from her employer to the DCA office prior to and on April 10, 2017. However, the ALJ concluded "the letter [wa]s not complete, as it [wa]s insufficient to demonstrate the necessary income information for L.B., whether to complete an adjustment to her subsidy due to her employment or for the purpose of renewal of her case."

Further, the ALJ found

L.B. received program documentation and information affirming her obligation to provide necessary income information, including the production of pay stubs, regarding the household's income. . . . L.B. knew income information was necessary, not just

10

employment information, for the agency to calculate the amount of her contribution to the rent under the program. . . . L.B. failed to provide complete income information in a timely manner, whether for an adjustment to her subsidy amount due to her employment . . . or for her renewal.

. . . [F]irst time pay stubs regarding L.B.'s employment . . . were provided to DCA . . . on August 14, 2017, as . . . confirmed by Whitecloud as having received the pay stubs on that date, and L.B.'s admissions. . . . [T]he production of the pay stubs occurred more than ten days from the change in income due to petitioner's employment commencement . . . or at least within ten days of receipt of her first paycheck, and was more than ten days from the date L.B. asserts the pay stubs were first requested from her by Whitecloud during a call in July 2017.

          . . . .

. . . L.B. failed to timely provide complete income information necessary for the administration of the program. Although L.B. adamantly relies upon her assertion that she never was asked for pay stubs until Whitecloud spoke to her in July 2017, this does not square with the program documentation obligating families to provide confirming income information, including the TIF packets completed by L.B., which specify that the participant must provide "two current and consecutive original pay stubs[.]" It further is contrary to L.B. confirming that she knew employment information was needed, and knowing that the program calculation of the subsidized rental portion is based upon one's income.

[(Third alteration in original).]

Therefore, the ALJ determined "DCA's decision to terminate L.B. from the Section 8 program, effective May 31, 2018, was appropriate." The ALJ found:

> L.B. did not comply with the program obligations, acting contrary to 24 C.F.R. § 982.551(b)(1), failure to supply information to DCA necessary for the administration of the program; 24 C.F.R. § 982.551(b)(2), failure to supply information requested; 24 C.F.R. § 982.551(b)(4), the information supplied must be true and complete; and 24 C.F.R. § 982.552(c)(1)(vi), due to L.B. owing rent to DCA in connection with the Section 8 program, in excess of the threshold amount of $3,000 which otherwise would have enabled entering into a payment agreement.

As to L.B.'s termination for her improper relocation, the ALJ found:

> L.B. failed to promptly advise DCA that she intended to vacate her unit; failed to promptly advise in writing that she was terminating her lease; and L.B. did vacate her unit as of December 1, 2018, knowing that she was not in good standing with the program and could not vacate the unit at the time and expect to have her voucher transfer with her to the new unit.

Thus, the ALJ "[c]onclude[d] that L.B.'s actions and failure to act timely and appropriately violated 24 C.F.R. § 982.551(i), absence from the unit; 24 C.F.R. § 982.551(f) notice of move or lease termination; and 24 C.F.R. § 982.551(b) and (h), use and occupancy of the approved unit." Based on these

12

violations, the ALJ determined "the decision to terminate L.B. from the Section 8 program effective December 31, 2018, was appropriate."

Jacquelyn A. Suarez, Acting Commissioner, DCA, reviewed the ALJ's initial decision, L.B.'s exceptions and DCA's reply to the exceptions. She adopted the ALJ's initial decision as DCA's final decision.

As to L.B.'s failure to submit necessary information, the Acting Commissioner noted "DCA has discretion to determine what information is necessary in its administration of the Section 8 voucher program. 24 C.F.R. § 982.551(b)(1)." In this regard, the Acting Commissioner stated "DCA required L.B. to supply a letter of employment, contact information for her employer, pay stubs, and other pertinent information necessary to verify her employment and change in income."

However, the Acting Commissioner found L.B. provided only an offer of employment letter without certain required information. For example, the Acting Commissioner stated the letter indicated L.B. would be a temporary employee without further explanation. Additionally, the letter did not include the address of L.B.'s employer or the hours she was expected to work.

Further, the Acting Commissioner noted DCA did "not immediately terminate[]" L.B. from the Program. Instead, DCA attempted to contact L.B. to

obtain the outstanding information. Moreover, the Acting Commissioner found DCA paid L.B.'s rent in full for months despite L.B. "working and making more money than when she initially enrolled in the voucher program." Further, the Acting Commissioner noted L.B. failed to comply with the Program's requirements for recertification.

In addition, the Acting Commissioner rejected L.B.'s argument that DCA should have used the EIV system to calculate her income because L.B. was required to report any changes in her income. Further, DCA was not obligated to use EIV and to impose such an obligation would be burdensome. Moreover, the Acting Commissioner noted de la Cretaz and McGovern-Smith testified that L.B. failed to provide adequate information to verify through EIV.

The Acting Commissioner determined L.B. repeatedly failed to provide income information despite efforts by DCA staff to obtain the required information. The Acting Commissioner found L.B. received "nearly $9,000 in rent payments she was not entitled to in direct violation of 24 C.F.R. § 982.552(b)(2) [which] warrant[ed L.B.'s] termination from the Program."

As to L.B.'s unauthorized relocation, the Acting Commissioner noted "participants in the voucher program are obligated to notify" DCA "and the owner before vacating a unit or terminating a lease[, citing] 24 C.F.R. §

14

982.551(f)." The Acting Commissioner explained Program participants must provide forty-five days written notice of intent to relocate and may not transfer their housing voucher without being in "good standing with the Program."

The Acting Commissioner found L.B. verbally asked about moving when her benefits were under appeal for failing to report a change in income. Moreover, the Acting Commissioner found L.B. was advised to await the outcome of that appeal and she was not given approval to relocate. Nevertheless, L.B. "relocated without proper notice or clearance from DCA."

The Acting Commissioner rejected L.B.'s argument that a delay in authorizing Section 8 funding for her new apartment was the appropriate remedy for her unauthorized relocation rather than termination from the Program. The Acting Commissioner explained delayed funding was only "appli[cable] to properly conducted changes of residences." The Acting Commissioner found L.B.'s relocation was improper because she: (1) relocated while her status in the Program was uncertain; (2) failed to notify DCA prior to relocating; and (3) relocated while not in good standing.

II.

On appeal, L.B. argues: (1) de la Cretaz was not a credible witness and to the extent her testimony was relied upon, DCA's decision was not based upon

15

the substantial credible evidence; (2) DCA's termination for insufficient income reporting was arbitrary, capricious, unreasonable and contrary to law, specifically its own Section 8 [A]dministrative [P]lan; and (3) DCA impermissibly, without an evidentiary hearing, determined she was not in good standing and her pending appeal warranted termination, not delay, of her benefits for moving without permission.

Our review of administrative agency actions is limited. See In re Herrmann, 192 N.J. 19, 27 (2007). Therefore, "[a]n administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Id. at 27-28. "The burden of demonstrating that the agency's action was arbitrary, capricious, or unreasonable rests upon the [party] challenging the administrative action." J.B. v. N.J. State Parole Bd., 444 N.J. Super. 115, 149 (App. Div. 2016) (alteration in original) (internal quotation marks omitted).

Appellate review includes:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

16

[Herrmann, 192 N.J. at 28 (quoting Mazza v. Bd. of
Trs., 143 N.J. 22, 24 (1995)).]

"A reviewing court 'must be mindful of, and deferential to, the agency's expertise and superior knowledge of a particular field.'" Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 158 (2018) (internal quotation marks omitted) (quoting Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009)). Further, "[a] reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" Ibid. (alteration in original) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).

We are "in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." Ibid. (alteration in original) (internal quotation marks omitted) (quoting Dep't of Child. & Fams., DYFS v. T.B., 207 N.J. 294, 302 (2011)).

1.

L.B. argues de la Cretaz was not a credible witness. She notes de la Cretaz testified at the informal hearing "that L.B. had not provided any proof of employment . . . before April 2017." However, during the ALJ hearing, de la Cretaz testified she saw both the November 15, 2016 and the February 23, 2017 employment letters prior to April 2017. Moreover, de la Cretaz remembered

L.B. appeared at the office lobby window prior to April 2017, possibly in November 2016 and February 2017, and de la Cretaz told L.B. to bring additional further documents. Thus, L.B. contends the DCA's decision, relying on the ALJ's initial decision, was not based upon the substantial credible evidence in the record and should be reversed.

The ALJ, after hearing de la Cretaz's testimony, found L.B. provided the November 15, 2016 letter to DCA as of November 22, 2016, and L.B. submitted the February 23, 2017 letter to the housing office prior to April 10, 2017.

Nevertheless, the ALJ concluded the November "letter was insufficient to confirm L.B.'s work status or earnings" and the February letter was "not complete, as it [wa]s insufficient to demonstrate the necessary income information for L.B., whether to complete an adjustment to her subsidy due to her employment or for the purpose of renewal of her case."

Moreover, the ALJ found: de la Cretaz's April 10, 2017 letter to L.B. confirmed L.B. needed to submit pay information; Whitecloud's April 28, 2017 letter to L.B. included a TIF packet; and Whitecloud's June 28, 2017 letter to L.B. requested employment verification and bank statements.

The Acting Commissioner found:

> As explained in the testimonies of . . . de la Cretaz and
> . . . McGovern-Smith, . . . [L.B.] repeatedly failed to

A-2871-23

furnish sufficient income details over many months, despite attempts by case workers to obtain the outstanding information.

The clear import of de la Cretaz's testimony was not when she initially received the insufficient February 2017 letter. Instead, the testimony of de la Cretaz and Whitecloud and the letters sent to L.B. firmly established L.B. was aware of her obligation to provide more detailed financial information and she failed to do so. Under these circumstances, the Acting Commissioner's factual finding is supported by the substantial and credible evidence in the record.

2.

L.B. contends she complied with DCA's policies and the agency penalized her despite reporting "her temporary employment . . . within [ten] days of when she started in November 2016, as well as when her employment was extended in February 2017." L.B. claims that if she waited for receipt of her first pay stub she would have violated DCA policy specifically warning Program participants not to wait until "the first paycheck is received." Moreover, she argues the information she provided was "sufficient for DCA to submit third party reverification to her employer as well as to utilize the 'mandated' EIV system."

DCA contends the November 2016 and February 2017 letters L.B. supplied failed to satisfy her "obligation to provide sufficient documentation of

A-2871-23

her change in income from November 2016 through August 2017" because the letters "did not include the number of hours L.B. would be working." Moreover, DCA asserts L.B.'s May 11, 2017 updated TIF remained deficient because it failed to provide her income, hourly rate, or hours worked.

In addition, DCA contends L.B. failed to provide required pay stubs with her signed TIF. According to DCA, even if L.B. was unable to provide pay stubs as of November 2016, she could have provided pay stubs by February 2017, when her employment was extended. By signing the TIF, DCA argues L.B. "understood her duty to provide such pay stubs."

Further, DCA notes the Acting Commissioner's finding that "two case managers made repeated requests to L.B. to provide adequate information" in letters, stipulated as received by L.B., on April 10, 28, and June 28, 2017, and L.B. still "failed to provide the documentation requested."

DCA contends L.B. did not provide adequate income information until August 14, 2017, and by then she owed $8,963.40, representing months of unjustified rental payments. Moreover, since L.B.'s debt amount was almost triple the threshold limit for a repayment agreement, the DCA claims its decision to terminate L.B.'s Section 8 voucher was required.

A-2871-23

DCA further asserts "the mere fact that DCA must use the EIV to verify reported income does not change the fact that L.B. still failed to comply with her responsibility to adequately report income." DCA contends EIV is not a replacement for L.B.'s compliance with the reporting requirement.

Applying our well-established standard of review, we conclude DCA correctly applied 24 C.F.R. § 982.551(b). DCA required necessary information to verify L.B.'s income. However, because L.B. failed to timely respond, despite DCA providing ample time for her to do so, she incurred a substantial debt that resulted in the termination of her Section 8 benefits. Therefore, we are convinced L.B. failed to satisfy her burden regarding DCA's final agency action in terminating her Section 8 benefits for failure to provide income verification.

3.

L.B. contends DCA relied on her pending appeal to improperly determine she was not in "good standing" to justify termination of her Section 8 voucher. She asserts the factual disputes regarding termination of her Section 8 benefits required an evidentiary hearing, relying on our opinion in Bouie v. New Jersey Department of Community Affairs, 407 N.J. Super. 518, 536 (App. Div. 2009). Therefore, she contends, "under Bouie, DCA could not lawfully terminate [her] Section 8 rental assistance benefits until [the] ALJ hearing process was

21

completed and DCA's [f]inal [a]gency [d]ecision was issued on April 15, 2024." Further, she asserts nothing in federal statutes or Section 8 regulations state Section 8 housing participants lose their rights as a result of an appeal challenging termination from the Program.

Moreover, while L.B. acknowledges she relocated without first formally notifying DCA in writing as required by 24 C.F.R. § 982.551(f), she nevertheless asserts DCA is permitted to approve the transfer contingent on her payment of the full market rent until DCA inspected and approved the new location. According to L.B., her attorney made a written request for such approval by the DCA, but DCA and the Acting Commissioner denied the request. She contends DCA erred as a matter of law in refusing to allow the transfer of her Section 8 subsidy and the agency's decision should be reversed.

DCA contends L.B.'s reliance on <u>Bouie</u> is misplaced because she "misconstrues <u>Bouie</u> and the Administrative Procedure Act (APA)." DCA asserts "<u>Bouie</u> stands for the proposition that a dispute over the termination of an individual's housing voucher constitutes a 'contested case,' within the meaning of the APA, and thus DCA is required to transmit such matters 'to the OAL for a hearing before an ALJ.'" DCA contends "[t]his is, of course, what [it] did for both of L.B.'s housing voucher terminations." DCA argues "[t]he

finding that L.B. was not in good standing at the time she moved [wa]s merely an underlying fact supporting the second termination and not a legal prerequisite."

Further, DCA contends "pursuant to the [APA], to be out of good standing, means that a 'participant' is not in 'full compliance' with the Program's rules; it does not mean that participant has been fully terminated from the Program."

Nevertheless, DCA avers that "even setting aside whether or not she was in good standing with the program when she moved, L.B. concedes that she violated 24 C.F.R. § 982.551(f) when she moved out of her apartment without informing DCA" and therefore, her "termination was . . . reasonable regardless of her status with the Program."

Finally, DCA argues a "delay in funding" was unavailable because the applicable "provision of the [APA] applies when the participant properly secures a change of residence" however, L.B. did not properly secure a change of residence because she "violated HUD regulations and DCA's procedures."

The Acting Commissioner noted:

> Per HUD regulations, participants in the voucher program are obligated to notify [DCA] and the owner before vacating a unit or terminating a lease. 24 C.F.R. § 982.551(f). According to [DCA's] Administrative Plan, participants must provide written notice forty-five days before intending to move from their unit and

cannot transfer their voucher if they are not in good standing with the Program. . . .

The Acting Commissioner found:

> L.B. verbally inquired about moving while her program status was under appeal. . . . Her program status was uncertain and under appeal due to her . . . failure to provide timely and adequate substantive information regarding her income, as required under 24 C.F.R. § 982.552(b)(2).

Applying our well-established standard of review, we conclude DCA correctly applied 24 C.F.R. § 982.551(f) and its Administrative Plan. L.B. acknowledged she violated DCA's Administrative Plan when she failed to notify the agency forty-five days before relocating. Her violation was compounded after she disregarded DCA's instruction not to relocate until her appeal of its termination decision was resolved. She, nevertheless, moved to another apartment. Under the circumstances, we conclude L.B. failed to satisfy her burden regarding DCA's final agency decision terminating her Section 8 benefits.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

24